## Case No. 4,058.

### In re DRAKE.

[14 N. B. R. 150; [1] 3 N. Y. Wkly. Dig. 50.]

District Court, D. New Jersey. March, 1876.

BANKRUPTCY—ATTORNEY'S FEES.

1. The compensation of the assignee's attorney must be reasonable, and proportioned to the value of the estate.

[Cited in Re Cook, 17 Fed. 330.]

[2. Approved in Re Cook, 17 Fed. 331, on the point that an attorney, in performing the ordinary duties of the assignee, cannot claim from the estate compensation as for professional services.]

[In the matter of Priscilla C. Drake, a bankrupt.]

NIXON, District Judge. The accounts of the assignee having been audited and allowed by the register, and no creditor objecting, they will also be passed by the court, and the assignee is discharged from liability, under section 5096 of the Revised Statutes.

There is also before me a petition from gentlemen, signing themselves as attorneys of the assignee, asking for an additional allowance of two hundred and fifty dollars, for professional services in the settlement of the estate. Upon an examination of the account, I find that the whole assets consist of two items: to wit, proceeds of the sale of personal property, three hundred and eighty-four dollars and thirty cents, and of real estate, nine hundred and seventy-five dollars, making an aggregate of one thousand three hundred and fifty-nine dollars and thirty cents. The disbursements for reducing the assets into money consist principally of two items: to wit, two hundred and forty dollars and sixty-nine cents, paid to these attorneys for their expenses and allowance for filing the petition in bankruptcy, and two hundred and seventy-one dollars and forty-one cents, also paid to them; the bulk of which is an allowance of two hundred and fifty dollars on account of professional services to the assignee. The register makes the assignee's commissions one hundred and thirty-three dollars and ninety-eight cents, and adds, for register's and clerk's fees, seventy dollars and ten cents. Including a few small items for printing, postage, etc., the disbursements amount to seven hundred and twenty-six

---

[1] [Reprinted from 14 N. B. R. 150, by permission.]

dollars and three cents—more than fifty per cent of the amount collected—leaving for distribution amongst the creditors six hundred and thirty-two dollars and twenty-seven cents. From this sum, before any dividend is struck, the attorneys ask for an additional allowance of two hundred and fifty dollars.

The case seems to be a proper one in which to make some observations in regard to the administration of estates in bankruptcy. It requires a constant and distasteful struggle on the part of the court to keep down expenses. In view of the lack of success in this matter, I do not wonder that so strong a sentiment exists in the public mind for the repeal of the bankrupt law [of 1867 (14 Stat. 530)]; creditors cannot be expected long to favor a system of liquidation and settlement which allows the great bulk of the small estates to go into the pockets of the attorneys, assignees, and other officers. If no power and disposition exist in the court to control the expenses, the sooner the law is repealed the better it will be for the creditors and the public morals. The evil is not new; it has been a source of serious complaint, and has long characterized bankruptcy proceedings in England. Lord Eldon signalized his advent to the woolsack, in 1801, by freely expressing his opinion in regard to the existing abuses in that court, and his determination not only to reduce expenses, but to repress all dishonest practices. It is said by the reporter, at the opening of the sixth volume of Vesey, Jr., Reports, that the lord chancellor took the first occasion to observe with warmth, that "the abuse of the bankrupt law is a disgrace to the country, and it would be better at once to repeal all the statutes than to suffer them to be applied to such purposes. There is no mercy to the estate; nothing is less thought of than the object of the commission; as they are frequently conducted in the country, they are little more than stock in trade for the commissioners, the assignees, and the solicitor. Instead of solicitors attending to their duty as ministers of the court, for they are so, commissions of bankruptcy are treated as matters of traffic," etc.

I am satisfied that the chief source of the extravagant expenditure in the winding up of estates in bankruptcy can be traced to the creditors themselves, who have the largest interest in a faithful administration, and who are the loudest in their complaints of the expenses of the settlement.

First. The act confers upon them the choice of the assignee. This is the most important step in all the proceedings, because so much depends upon his character, qualifications, and habits of business; and yet they rarely give any personal attention to these traits in making their selection. Whenever any of their debtors go or are put into bankruptcy, they generally prove and then surrender their claim to the lawyer—who too often makes it his business to look up such matters for professional management—and after clothing him with full powers by executing a letter of attorney, they dismiss the subject from their thoughts; if afterward they are surprised by a dividend, they regard it as so much saved from a total wreck, and as clear gain; whether this indifference is the result of past disappointments in realizing from the estate in bankruptcy, or whether it comes from their greater absorption in other and more profitable business affairs, I am not able to say—but the fact exists; and I am clear that the most salutary amendment which could be made to the act to-day, would be to take the power of selecting assignees from creditors, and, in the first instance, to vest it in the register, subject to the supervision of the court, on the appeal of any of the creditors.

The case before me is an illustration of the practical working of the present method. The bankrupt was a married woman residing in Hudson county, New Jersey, and carrying on the business of hatting at No. 9 Bowery, New York; she had some eight or ten creditors, whose claims aggregated nearly six thousand dollars; she owned real estate in New Jersey, which one of the creditors, in the course of these proceedings, swore was worth, above the incumbrances, about twelve thousand dollars; her stock of goods, in her store, was valued at four hundred dollars, and this was seized on attachments issued against her husband, and held by the sheriff of New York, for the payment of his debts. Her creditors became alarmed, and finding that she had committed an act of bankruptcy, by allowing her commercial paper to go to protest, they filed a petition of bankruptcy against her in this court; no opposition was made, and an adjudication followed as a matter of course. The register gave notice of the first meeting of creditors for the choice of an assignee, and on the day appointed, one of the members of the legal firm who filed the petition appeared before the register, with eight proofs of claim, from as many creditors, and with eight powers of attorney to vote thereon, and cast the eight votes for the present assignee: whether the creditors knew anything about the gentleman thus selected does not appear. The court knows nothing to his detriment, except that he has given very little attention to a solemn trust, which he voluntarily assumed. If the affidavits of the members of the law firm, filed in these proceedings to exhibit to the court the character and extent of their services, be true, he has done nothing since his selection except to allow these attorneys the use of his name, in the performance of the duties which he undertook when he consented to the appointment.

Second. The bankrupt act gives to creditors a voice, and a large control over the expenses of the administration of estates in bankruptcy. The 28th section of the original law makes provision for the third meeting of

creditors and a final dividend; but before it is declared, it is the duty of the assignee to submit his account to the register, and file the same, and to give notice to the creditors of such filing, and also that he intends to apply for the settlement of his account, and for his discharge from all liability as assignee, at a time to be specified in the notice. Inasmuch as, in this district, under the provisions of the 5th general order, the court does not allow the discharge of the assignee until after a personal inspection and examination of the account by the judge, all creditors have two opportunities to take exceptions to the account: (1) Before the register, and (2) before the judge of the court. But it is my observation that they rarely avail themselves of these opportunities, and when they do, their voice and control are more frequently exercised in increasing than in diminishing the cost and allowances. It has happened more than once, when I have suggested that there must be a reduction of the fees and expenses of settlement, that I am answered by the statement that the creditors, who are the principal parties in interest, have examined and approved the charges before the register. I find also an illustration of this liberal and generous spirit on the part of the creditors, in the case before me. Shortly after the appointment of the assignee, the attorneys of the petitioning creditors came to the court for an order upon the assignee for the payment of their disbursements, and for an allowance for filing the petition and procuring the adjudication. As this is presumed to be a service performed in the common interest of all the creditors, it is usual to award for it a moderate sum out of the common fund. The application of the attorneys was supplemented by a petition, signed by the largest creditors of the bankrupt's estate, setting forth with considerable particularity their knowledge of the meritorious labors of these gentlemen in this regard, and stating that two thousand five hundred dollars "would be no more than a just and reasonable sum" to award them for these services; such an allowance, besides disbursements, was gravely asked for by creditors most largely concerned in the economical administration of the assets, and if the court had yielded to the absurd and preposterous suggestion, and awarded more than the gross assets of the estate, for preparing and filing the petition of bankruptcy, these gentlemen would doubtless have been the noisiest in denouncing the waste and extravagance incident to proceedings in bankruptcy.

And now what is to be done with the present application for further allowance? Here is an estate amounting in the gross to less than one thousand four hundred dollars; more than half of it, seven hundred and twenty-six dollars and three cents, has already been expended in its settlement, and more than one-half of this expenditure has gone into the pockets of the attorneys. We have six hundred and thirty-two dollars and twenty-seven cents for distribution, and from this sum they ask for two hundred and fifty dollars more. If I refuse it, the court is parsimonious and behind the times, in its estimate of the value of professional services; if I allow it, then the bankrupt law is a failure, because the court is not more watchful over the expenses of its administration. In these times, when care, economy, and parsimony in the use of other people's money are by no means prevalent, I shall dare to be singular, and deny the application. I do this the more readily, because the attorneys of the assignee seem to have such a good understanding with the creditors that they have been appointed to represent their interests in voting for the assignee. If the court is illiberal, and is not able to comprehend the magnitude and value of the services rendered, these creditors have it in their power, out of the small dividends received, to allow them such additional compensation as they think in strict justice should be made. The application is refused.